The imposition of common carriage on mobile broadband is unlawful for a separate and additional reason, which is that, among other requirements, the statute says that before a mobile service may be subject to common carriage, it must be interconnected with the public switch network, and mobile broadband isn't. Congress, when it wrote that provision, had a particular network in mind, and everywhere other than the order under review that that phrase has been used, it's been a term that's referred to the public switch telephone network. That's right, and that's why, for example, it was perfectly permissible for the commission to say that the network includes pagers that also terminate in the same 10-digit telephone numbers, but the commission's discretion can't extend to adopting a regulation that violates a clear aspect of the statute, and one aspect of the statute that's clear and ambiguous is that the public switch network can only be a single network. Can I just step back one level of generality before? I know that the linchpin of your argument is public switch network, but it seems to me that one thing that's going on here is that we're taking a statute that, let's just suppose, was designed primarily to deal with phone, and we're applying it to the category of mobile services to include mobile broadband. So the gateway is mobile services, that's what this provision's about, we're applying it to mobile broadband, and then if we had to ask the question, well, there's two categories, there's commercial mobile service, and there's private mobile service. If we don't get to public switch network, then what's the reason to think that Congress would have thought that mobile broadband would be commercial mobile service rather than private mobile service? I'm not sure I understand the question. Why would Congress have thought that mobile broadband was private mobile service as opposed to commercial? Yeah, I'm sorry, I think I said it in exactly the reverse, sorry. The term private in the statute doesn't mean non-commercial, so for example, private land mobile services, which was in the statute right before Section 332 was enacted, defined certain services as private land mobile services, quote, regardless of whether they are provided indiscriminately to eligible users on a commercial basis. The word private in this context, I think, means private carriage, and is distinct from services that are interconnected with the public switched network. So commercial services can be private, large services can be private, the Internet was a private mobile service for years and years, and the Commission reaffirmed that repeatedly until the order under review. So I understand Your Honor's question about stepping back, but I really think once you step back, you wind up back forward again into the question, is this interconnected with the public switched network? And on that point, the public switched network has to be a single network. The Commission said in 396 it acknowledged that there is a single network requirement, but what it did here in its rule was combine two different networks, the network that ends in 10-digit telephone numbers and the network that ends in IP addresses. In other words, what it says is now a single switched network. That is what its rule says. Yes. Its rule says the network that uses either 10-digit telephone numbers or IP addresses, but that's like saying the country whose capital is either London or Paris. You have defined two countries, even though you said the, and the Commission has defined two networks here, and we know this from two things. First, the cornerstone of the Commission's theory in the mobile section of its order is ubiquitous access. It says that the Internet is a commercial mobile service because it provides ubiquitous access. But while the telephone network provides ubiquitous access among people who have telephone numbers and the Internet provides ubiquitous access among people who have IP addresses, there's no ubiquitous access if you take the two networks collectively. If you have just a mobile phone number, you can't reach any of the hundreds of millions of endpoints that have IP addresses. So the whole notion of what it means to be interconnected to a network, not connected but interconnected to a network, it means there's mutuality. It means everybody who gets on it from any point can reach everybody who is on it from some other point. So what do you think the Congress had in mind when it gave the Commission authority to define interconnected? It's actually a very specific purpose here that was indicated in the legislative history and that the Commission articulated in the second report in order, relying on that legislative history, that it issued right after Section 332's enactment. What it wasn't was a decision by Congress to tell the Commission, as new networks come into being that we haven't thought of yet, we want you, not us, to make the momentous decision about whether they should be subject to common carriage. That was not what it was about. What it was about is that there had been emerging services that were competing directly with cellular voice but weren't being regulated as stringently as cellular voice. And Congress said that's an asymmetry, that's unfair, and so it enacted this provision to ensure that all direct competitors of cellular voice would be regulated the same way. And so the phrase interconnected with the public switch network was a way of getting at the question of who is competing with whom. Because if you're interconnected to the same network and you're providing essentially the same connectivity to the same people, Congress said you're providing the same service. And that same point was behind the Commission's rule, which it disregarded here, but it has never changed, defining what would be functional equivalence. Functional equivalence was an antitrust market test to determine whether a service was a service. The Commission's rule says you look at whether a price increase in one service would shift demand to the other. It, too, was looking at the question, are these services competing with cellular voice? That was an important purpose. But it was not a purpose to say if some new network comes into being, you can sew it onto the existing network and call it one network and impose common carriage on it. The reason Congress said the public switch network is that it had a particular network in mind. It was delegating to the Commission the power to define the bounds of that network for purposes of making sure that all direct competitors, pagers, others, were swept in to the same regulatory scheme. But it wasn't saying when a whole new network comes into being that we haven't anticipated. And everybody agrees, the Commission and we, the Commission when it wrote this statute wasn't thinking about the Internet and didn't anticipate it. It wasn't saying when a new network comes in, you can just add that into the public switch network. And, you know, even Note 35 in the Commission's own brief quotes approvingly a commenter who says the telephone network is one public switch network. The Internet is another. Congress didn't say a public switch network or any public switch network. It said the public switch network because it had one particular network in mind. And the only other point I would want to make about this wireless issue is that this was violation was particularly stark. There is one sentence in the NPRM. I wondered about that. Suppose we actually agree with that. Is there, I'm wondering about whether it's harmless, is there any argument in your brief in this court that wasn't before the Commission as part of CTAI's white paper? Yes. Yes, Your Honor. Tell me what that is. First of all, we never... I looked at them both. I didn't see any big differences. Here are some of the key arguments that weren't there. First of all... You would agree, by the way, that if all the arguments you make are there, then it's not a notice problem. Yes. That's how I understand the... I mean, they may have violated the notice requirements, but it would then be harmless and harmless. So now tell us what are the missing arguments. Yes. First of all, nowhere in our comments or our ex-parties or anything we filed did we ever have the opportunity, did we ever address the point that the Commission can disregard the functional equivalence test in its rule and instead define functional equivalence solely on the basis... Right. I got that. Right. We didn't argue that. What about... And on the public-sourced network, we never were able to argue that you cannot combine two networks into one because the existing rule prohibited that, and the Commission changed that rule. And that was the rule on interconnected service, and the change the Commission here made was much quieter, with much less discussion than the other change. But that rule had said previously that an interconnected service is one which lets all users on a network send or receive calls to or from, quote, all other users. And the Commission amended that by deleting the word all. So it just says that you can reach other users. And it did that for the reasons I was just indicating, which is it had combined two networks into one. It wanted to call that a single network, and it wanted to say that it didn't matter, that there was no mutuality of interconnectivity. We never addressed the proposed rule change, and this was a rule change. This wasn't just some rationale or thought. This was an amendment of an existing rule. And the one sentence that the Commission relies on in its NPRM was just a sentence that said, for mobile broadband in an access service, does it fit within the definition of commercial mobile service? That was all. And there was a footnote that cited the rule defining public switch network. Now, anyone, I think, reading that would think, oh, they want us to comment on whether or not the existing rule applies to mobile broadband. There was no suggestion they were going to amend that rule, no suggestion how they were going to amend that rule, no suggestion they were going to amend the rule on interconnected service requiring all users, no suggestion they were going to combine two networks into one, no suggestion they were going to disregard the functional equivalence test that was in their rules and instead substitute for this case only a ubiquity test. And particularly, whatever the force of notice obligations are in any other context, when an agency is talking about changing its rules and changing its standards and applying a different test than the one that is in the CFR, that is where the notice obligations should be most strongly enforced, because there's no way in commenting on things like this any of us are going to be able to anticipate all the different possible ways, if everything's up for grabs, that the Commission might change its rules. And the proof really is in the pudding here, because, Judge Tatel, you asked what we didn't address. We were highly motivated after the President came out with his statement urging the broadest everything in the record that we could that would respond to what the Commission looked like it was now going to do after this whole NPRM changed course. And we did put in extensive submissions, the CTIO white paper was one, Verizon, AT&T, everybody put in submissions that were our attempt to address everything that was on the horizon. But we missed actually the critical rationales in the Commission's decision. We didn't know they were going to change their functional equivalence test. We didn't know they were going to substitute a ubiquity test for it. We didn't know they were going to combine two networks into one by amending their rule on interconnected service. And so the notice violation here wasn't harmless. We actually didn't present the kinds of arguments that the last, you know, 12 minutes or so that I've been at the podium, we've all been discussing. Can I ask you a question about the practical implications of this piece of the case? So if we're at this point of the case, then we've assumed that the reclassification was okay, but for mobile. And then there's a separate argument as to why there's a problem with respect to mobile. So just to break it down to brass tacks, if I have a tablet, and I'm, I have two options for accessing the web via my tablet. One is via Wi-Fi, which I think counts as a fixed broadband. And the other is via some cell connection, which is mobile broadband. And it may be, it may vary which connection I have based on where I am in my house. If I'm down the hall, maybe the web, the Wi-Fi fixed broadband connection goes off and the mobile connection fits in, kicks in. Maybe vice versa if I get closer to the router. So my question is, if you prevail on this argument, would it mean that where I am in my house determines whether I'm subject to blocking? You know, Your Honor, I think that would be a question very well suited for the commission's, you know, vaunted technical expertise. Okay. You know, the one thing that I can say is that there are two different tests, both of which have to be met, have to be met before a mobile broadband service can be classified this way. One is the definitional test and the other is the Section 332 interconnected with the public switch network. And in fact, the commission has in the past applied different rules and different standards to mobile and to fixed. So, for example, in the 2010 intranet order that was reviewed in Verizon, the rules were different between fixed and mobile. And I suppose, Your Honor, a scenario could come up there as well. And unlike some of the things we've been discussing, that really may well fall within the kinds of interstices of the act that you would at least want to see what kind of record the commission brought and what it said about it and how to deal with it. But there's no question that there can be an asymmetry here. There was an asymmetry years ago and the statute contemplates it by having these different requirements. Let me ask one other question, which is the way this argument comes up is that there's a prohibition against common carrier treatment if we're talking about a private mobile service. Based on the argument we had earlier today, there's a mandate for common carriage treatment if you're a telecommunication service. So, the statute is at loggerheads, potentially. And what the commission says is, in order to alleviate that loggerhead, in order to make sure that we don't have this impasse, we're construing commercial mobile service in a way that encompasses mobile broadband. Now, of course, you have the argument that they can't do that because it doesn't comport with the statutory meaning of public switch network. I guess my question is, if the statute potentially puts one at this loggerhead, does the specific grant of authority to the SEC in 332 give it some forceful authority to deal with these kinds of issues in the statute, or otherwise we'd be in equipoise? Well, the commission has acknowledged that there is a statutory contradiction here, but it didn't actually resolve that statutory contradiction. It didn't explain why. What it said is, one of the advantages of its separate finding about the service being interconnected with a public switch network is that it would remove the need to resolve what it called the statutory contradiction if it was a telecommunications service under one, but a private mobile service on another. The private mobile service provision is very specific. A private mobile service shall not be subject to a common carriage regulation. That is the more specific of the two provisions. But the private mobile service provision is the more specific of the two because it's not a general definition. It specifically relates to mobile broadband service. And in addition, I think to the extent there's any contradiction in the statute, there are two things that ought to influence how it's resolved. One is that the default in the statute clearly is no common carriage. All the provisions that impose common carriage do so very narrowly and in a very circumscribed way. A telecommunications carrier shall be subject to common carriage only to the extent that it provides telecommunications service. And a private mobile service is everything. That's not a commercial mobile service, and it shall not be subject to common carriage. And when you layer on to that the provision we were talking about in the last segment, Section 230, in which Congress said it's national policy that the Internet and Internet access should not be fettered by federal regulation, I think any question about how tensions in the statute between these two provisions gets resolved has to be resolved in the direction of no common carriage, not creating common carriage. And if I could just say a word about the Internet conduct standard, because the Commission said several times in the order that there was a consensus that it agreed with that there was a need for certainty and for clear, enforceable, bright-line rules. That's Paragraph 13. And in Paragraph 138, it says, by contrast, vague and unclear rules could stymie innovation. So they have their three bright-line rules, which are clear to their extent, but then they have layered on top of this the most vague and impossible-to-predict standard, which removes any level of certainty that is provided by the three bright-line rules. Because when the chairman was asked, what does the Internet conduct standard prohibit, he says, I don't know. That's there because we don't know today what we might want to prohibit, and we need to have that there as a backstop as we discover new practices. Well, what you deal with when you discover new practices is you issue a notice of inquiry. You issue a notice of proposed rulemaking. You establish a rule that prospectively makes them unlawful, if you can support it with a record. You don't create a rule that maximizes your enforcement discretion because you want to make sure that you will be able to retroactively declare anything you decide you don't like after the fact unlawful. And what really is striking about this is they even describe in the order practices that they say they're out there and we don't know whether they violate our new rule or not. The example they gave was the T-Mobile service that doesn't count music streaming against your data cap. So you get unlimited music streaming without having to pay for that. Consumers love it. The commission says we don't know yet whether this violates our Internet conduct standard. If they don't know, we certainly don't know. So every business practice which you can engage in is subject to this question, what is the commission going to think after the fact? And when you have a rulemaking in which specifically, as it has historically in this area, the commission says over and over again, certainty is important, predictability is important. If we don't have it, we're going to stymie innovation and investment. You cannot possibly consider non-arbitrary a rule which accomplishes exactly the opposite of that. And if the court has no questions. On your notice issue, the notice did refer to a redefinition of public switch network or didn't? No, Your Honor. Here's what it said. It said, for mobile broadband Internet access service, does it fit within the definition of commercial mobile service? And it had a footnote. The footnote cited one rule. They changed multiple rules, but it cited one rule, and that was the rule that defined public switch network. They say because they had the citation to the rule in a footnote, we should have anticipated that they might amend it. They don't actually tell us that we should have anticipated how they might amend it, which would have been useful, but they say at least we should have anticipated that they would amend it. Okay. To go back to Judge Tatel's question relating to functional equivalence, same issue. This was not addressed in your submissions to the commission, but it is in your brief. It certainly is in my brief. I know that. Yes, Your Honor. And it's different only in the sense that it's even worse, there isn't even one sentence in the NPRM on functional equivalence. No, but I'm just asking, I mean... Oh, in terms of what we've said. Yeah. Yes, we never addressed why it would be wrong for the commission to replace its existing rule defining a functional equivalence test with a new rule created for this case only. The commission says it's... No, I understand that, but the redefinition of public switch network is a separable issue, right? Right, right. And so, Your Honor, there are two different alternative grounds the commission is concerned here. Right, exactly. So with respect to the redefinition of public switch network, they never told us they were going to amend the rule on interconnected service to delete the requirement that a network enable you to reach all other users. That wasn't mentioned in the NPRM. Your point about that is even, assuming that's correct, that they didn't, you didn't solve that problem by commenting on it, right? Well, we didn't comment. We didn't address that. You didn't address that issue later. Correct. We didn't address it ever. We didn't. The two things, two of the things that we didn't address ever were their amendment to the rule on interconnected service and their ignoring their own rule on functional equivalence because there was no notice. So even though we put a lot of paper in, we didn't address those two things because we Thank you. May it please the court. Just on the last question, I would urge the court to read CTIA's opening comments. They do discuss functional equivalence. They may not. Well, but discussing it isn't the same as understanding that the commission is going to change its definition. Well, the commission didn't change the definition of functional equivalence. Their complaint is that the commission didn't. Well, let's take it one step at a time. Is there anything in the notice? What could you point to in the notice in the NPRM? Was there anybody that the commission was focusing on functional? The notice said that the commission was considering whether to reclassify mobile broadband. Right. And it said in addition, what would be the legal basis of doing that? And it said in addition, by the way, everybody, let's look at the governing statute, which is 332. Right. And 332 defines a private mobile service to exclude anything that's a commercial mobile service or the functional equivalent. So all anybody had to do was to look at the statute, which the commission had quite kindly or specifically identified in the notice itself in order to figure out that functional equivalence would have been an issue in the case. I think that the notice objection here really is a requirement, is trying to impose a requirement on the commission to write notice for a second grader. For what? For a second grader. And in this respect. Well, maybe a junior in high school. Maybe a junior in high school standard they're looking for. Okay. Fair enough, Your Honor. Junior in high school. Look, let me ask you this. Let's assume we don't agree with you about the notice itself. You say in your brief that CTIA discussed functional equivalent in its comments, right? Yes. But discussing it isn't the same or is it in your mind the same? It is. If we think there's a failure of notice in the interim, you think these comments satisfy? Yes. Why is that? Because they had every opportunity, time and time again, there were voluminous comments on precisely this issue from the mobile petitioners about why the commission cannot reclassify mobile broadband because of the terms of 332. And in the opening comments, CTI raised immediately the question of this cannot be a functional equivalent and they explained their position why that was the case. In their reply comments, they specifically discussed this question of public switch network and they said, they made the same arguments they make here, that it has to be the public switch telephone network even though the word telephone is not in the statute at all. So, time and time again, there was, as reference has been made, to a CTIA white paper which was a lengthy submission during the notice and comment rulemaking devoted solely to these mobile issues. So, including functional equivalence and including public switch network. So, there was ample opportunity, even if you think the notice was defective, which we do not. Go ahead. Sorry. Finish your sentence. Go ahead. You're the judge. I want to take you on the merits. Do you have anything more to say on notice? Excuse me? Sorry. Do you have anything more to say on notice? Yes, I do. Just one, just to repeat that the description of the commission having a single sentence in that section, and I urge the court to look at paragraph 149 and 150, is really, it seems to me, a misleading description. There were, the notice was brief, but the notice was complete. The notice included the goal or the general issue, which is all the APA requires that the commission wanted the parties to discuss. Should we reclassify mobile broadband in light of the changes in the marketplace? It then went further, and it said, does it fit within the definition of commercial mobile service? And the petitioners say, well, you just asked whether it fits within the definition, and we answered no, even though the statute says time and time again that these definitions are by regulation as the commission issues, I'll specify, is defined by regulation, defined in regulation by the commission. So the idea that somehow they were supposed to end their conversation or were blindsided by the idea that, well, you just asked us whether it fit, and we told you it doesn't, so that's the end of the story, is entirely inconsistent with any reasonable reading of 332, which is the statute we pointed them to and which governs the issues in this case. It really seems like it is putting the burden on the agency to walk the parties by the nose through these issues. So let me ask you a question about the merits, and I want to focus on the word interconnection. It defines interconnection as services interconnected with the public switch network. Now, before this regulation, before the commission's new regulations, my cell phone was interconnected with the public switch network, right? But now it can't, because it cannot reach phone numbers. It won't reach anybody who doesn't have a phone number. I'm assuming your honor has a cell phone that is not a smart phone. Yeah, exactly. That's my question. That's the kind of phone I have. I'm not any longer, quote, connected, interconnected, interconnected, not just connected, but interconnected with the public switch network. Well, the commission's updated rule, just to be clear, includes all devices that use North American numbering plan numbers. Yeah, I can still reach all North American numbers, but I can't reach anything that doesn't have that and just has an IP address. That's correct, your honor, but... So why am I any longer interconnected to the public switch network? Well... I can't switch my call to anybody on the public network. You can call everybody else. You still can call everybody else that has a cell phone and make a voice call. Only people who have phone numbers. That's correct. Okay, that's my question, yeah. So am I any longer interconnected? I know I'm connected, but I'm not interconnected in the sense that I can't be, quote, switched. Anybody on what the commission now calls the public switch network, which now includes the internet, right? I think it is clear you are still connected. I know I'm connected. Right, and I don't know that there's a difference between the use of the term interconnected and connected, that there is a distinction that Congress intended to be made. Prior to the regulation, I could, in fact, be switched to any North American number, right? I could reach anybody on the public switch network, right? But it was always... This goes to this question of the commission did remove the word all. I know, but I'm talking about the statute. I think it is a reasonable interpretation of interconnected to mean that you're interconnected to part of the network rather than every point on the network. I think that was the commission's position, even under the old rule, that, for example, the order cites this example of 900 number blocking. That didn't take cell phone providers or telephone providers out of the public switch network at that time, NANPI network, just because they didn't provide access to, say, 900 numbers. No, but that was a class of numbers. Excuse me? That was a class of numbers. Well, this is also... This isn't... I'm not... I'm not barred here from a class of numbers. I can't access anybody with an IP address. Well, Your Honor, I think that the issue here goes... Their argument goes to whether this is part of the network. And at least as to that point, it's quite clear you can have a network that is composed of subnetworks. So under the old rules, you could have said there's a cell phone network, there's a landline network, there's a pager network. All of those were undisputably part of the public switch network under the old rules. So that goes to this question of... Isn't the Internet now part of the public switch network? The Internet is... The Mobile Broadband Internet Access Service is interconnected with the Internet, which is now part of the public switch... To be specific, sites using IP addresses are part of the public switch network. To your point about interconnected, which I don't think the parties have raised, I think would be an equally reasonable position for the commission to take, or at least a reasonable reading of this statute, that to make no distance between interconnected and connected. If your honor is concerned about the aspect that it doesn't reach all points on the network, the commission dealt with that by saying it was never the case that you couldn't have a network that has to reach technically every point on the network. And it was legitimate, or it seems to me reasonable, permissible, for the commission to treat the network. And after all, it has tremendous broad discretion that Congress vested in... By the terms of the statute, because of the regulatory power, or the power to define the terms by regulation. But to unnetwork in light of the fact that devices like Judge Srinivasan's tablet can be reached both by voice call or a text message or an IP email, that that kind of convergence tells you that you can reach all or virtually all members of the public using IP addresses, using this... But just to understand that argument, or where it fits at least, that assumes that public switch network retains the same meaning that it had before, but the point is that there's a capability of reaching everybody on the old understanding of public switch network because of a convergence of technology? The convergence point, I think, goes to why the commission's interpretation of the network as single, that this conceiving this as a single network, is reasonable. I do want to get to the commission's alternative ground, that even if this is not a commercial mobile service, that it was the functional equivalence of commercial mobile service, and that doesn't require on anything conceptualizing these as a single network. It just focuses on the commission's determination that at the very least, it's the functional equivalent of what the old phone system was. You now can use the internet to reach, and this is the statutory term with regard to the definition of commercial mobile service, and that is if the Congress was focusing on whether you could reach the public or such classes of eligible users as to be effectively available to a substantial portion of the public. That's clearly true of the internet and using IP addresses to communicate. You can reach most people in the world now with an IP address communication. But that only applies, I mean, you're saying that it's a functional equivalent and then relying on the statutory definition of commercial mobile service. By analogy, that's what I think, if you wanted to look at what a functional equivalence to of commercial mobile service is to mean, it looks to whether it can perform that same function of communicating to at least a substantial portion of the public, and that's clearly in present day with the modern marketplace, what mobile broadband internet access service does. But the statute, it has to be the functional equivalent of a commercial mobile service, and commercial mobile service is a statutorily defined term, and commercial mobile service then takes you to another definition that talks about the public switch network. Yes, but I think on the public switch network issue, you cannot limit the statute to the public switch telephone network. First of all, when the commission first implemented this rule, it rejected an argument that it should state the rule in terms of a particular technology, a telephone technology. That's why it used NANPI numbers and not just the idea of the telephone. But in fact, what mobile petitioners are trying to do is read a word into the statute that isn't there. And if fidelity to the statutory text... Meaning the word telephone. The word telephone, right. But I guess what I'm not understanding is, I'm trying to understand what extra room functional equivalence gets you, and if you win on the notion that the statute, because it doesn't use the word telephone, can be read to mean public switch network as something broader than public switch telephone network, you've already won without getting the functional equivalence. I'm not urging the court to have us win twice. No, I know, but I'm trying to figure out whether you can win once. Okay. And that's not to say I'm going necessarily one way or the other, I'm just explaining where I am for the purpose of this question. Right, so maybe I don't understand. Which is, what extra are you getting out of functional equivalence? Because it seems to me that by the time you've gotten to functional equivalence, we would have, by assumption, already concluded... I think the functional equivalence is, if this court were concerned about the interconnection point to all points or the network issue, so putting aside whether it has to be the telephone network, but that it's not necessarily a single network or that it's not interconnected, functional equivalence doesn't require either of those, it doesn't involve either of those concerns. It's just we're looking to the function of the network and seeing whether it performs the same functions as a commercial mobile service. Going back to the public switch network, what's the best evidence you have that Congress intended the commission's delegation of definitional authority to include this? To include something as... I'm actually asking you to respond to Mr. Keisler's argument that Congress did have in mind the future expansion of the public switch network, but not this. Well, I understand his argument to mean that it's the public switch telephone network, and my best argument is the word telephone isn't in the statute. That's it, okay. What about the purpose that Mr. Keisler referred to? The purpose of competition of services that were competitive with the then known public switch network should be covered by the same regulatory scheme. But I actually think the purpose was something slightly different and important to support our argument. There was a dispute that some carriers had taken advantage of what had been defined as actually conduct a public commercial mobile service. This was predecessor, I think, of Nextel. And Congress was, in enacting the statute, specifically concerned with making sure that commercial mobile services were symmetrical with each other, that they competed if you were providing. And this is where I think the... This is consistent with what Mr. Keisler said. I think this is where the word private does some work. The definition is private mobile service. However you look at mobile broadband internet access service, it is hardly a private service. Well, that's what it's been until this, right? Excuse me? That's what it's been until... It's been defined... It's been private, right? Because it has not... Because until now, it hasn't been defined as either a commercial mobile service or its functional equivalent. But now, mobile broadband is not nascent, which was the... It was not in its infancy. And in earlier years, you could have thought of it as a developing service that itself wasn't as ubiquitous as it is now. The commission specifically points to the fact that 73.6% of adults age 13 or over, and apologies to Judge Patel, have a smartphone. And this is a... There is certainly a tipping point at some point to say that the service is now ubiquitous enough to take it out of that conception. But ubiquity was never part of functional equivalence, right? Was it? Well, I think that... It's a completely different service. Its ubiquity makes no difference. Milk is ubiquitous. I think that ubiquity comes into this congressional concern, which is reflected in the statutory terms about service to the public or substantially all portions of the public. And I think that's where that concern... And to go back to the word private again, the fact is the functional equivalence looks to whether or not this service, this can provide functionally equivalent... It's functionally equivalent to what commercial mobile service in its narrow form or the traditional form was, which was you could communicate with virtually everybody. Well, with mobile broadband and internet access, you can communicate just like you used to be able to, and you still are with the old phone service, with everybody in the country. And that's the function. That's the equivalence. And that's the function that we look at. And so that's why ubiquity does matter and why ubiquity was an important consideration when Congress passed it. Can we just go back to a question I asked earlier? And that is, did your refinement of the congressional purpose in any way undermine Mr. Keisler's contention as to the purpose? Well, I guess if Mr. Keisler is simply saying, well, they couldn't have had this in mind, the statute... No, we were saying they had a specific purpose in mind, and that is to have competitive enterprises governed by the same set of rules. Well, I guess... It makes a lot of sense. I would point the court back to the language of the statute, because this is not a statute that elevates its purpose over its terms. No statute does. But this statute in particular repeats time and time again, these terms are to be as specified by regulation by the commission. If Congress had a term of art in mind, it's a very odd way of implementing that purpose by giving the commission at every stage, with regard to every relevant definition here, regulatory authority to change the definition. If the court has no further questions. Thank you. May it please the court. When I call my wife on this iPhone, I use a telecom service provided by AT&T. But when I go to the Vonage app first, then dial, then according to the petitioners, I use something else. I take a laptop, plug it in, watch a movie on Netflix, I use a telecom service. Unplug it, take it to the park, as you, Judge Srinivasan, then according to the petitioners, I use something else. And they say to that, the petitioners do, that symmetry is trumped by an asymmetrical statute. But the problem is, the statute, as Mr. Keister just conceded, is not asymmetrical. Its goal was to create regulatory symmetry among like services. And to accomplish that goal, it decided to give the FCC significant discretion. In fact, the conference report shows that the Senate bill prevailed over the House bill because it would give the FCC more discretion. Their statement here is also impeached by what one of them said below. NCTA, in its comments to the FCC, said verbatim, you should harmonize the treatment of fixed and mobile broadband. What was properly harmonious below cannot be improperly symmetrical here. And even AT&T, its predecessor, Singular, back in 2004, argued, specifically to the statutory definition of commercial mobile service. As for the general conduct standards, they say that it would mire them in litigation and uncertainty. Most of them said the opposite below. They asked for a general standard, commercial reasonableness, case-by-case adjudication, Comcast said. And the nuanced approach that was recommended by the economists, Judge Williams, falls within that. We don't want bright-line rules, they said back then, except for AT&T, which had perhaps considered that no pay-to-play was okay. Now they say the opposite. We don't want the general standard. We can live, perhaps, with some of the bright-line rules. But if reasonableness was proper in commercial reasonableness, it cannot suddenly become improper in not unreasonably interfering. In fact, the latter formulation is less vague and more specific. On notice, both documents asked about reclassification. Both asked about the fit between reclassification and Section 332. Many petitioners answered the general question. They said reclassification is a bad idea. Only two, AT&T and CPIA, answered the specific question. And they did answer it. And I have a couple of JA sites for answers to the specific question of the redefinition of interconnected service. 2879, 2920, 303. But only those two answered the specific question. But those are the only two who are appealing this part of the order. So the others were not silent because they didn't know. They were silent because they did not care. And so this tactical silence cannot be used or parlayed into some lack of notice. And where is the harm? As you asked, Judge Tatel, this is the kind of pointed comment coming from the complaining parties, AT&T and CPIA, that makes them engineers hoist on their own petard under ALENA, the language of ALENA. What's the point of remand? They would change the date and file the same analysis. And as for the question of single versus two networks, Mr. Keisler's description of the prior definition elided it. What the FCC always said from 1994 was public switch network includes a number of switch networks. It was always a network of networks. Two years ago, Judge Tatel, we were before you in the Verizon case. And there Verizon argued and was vindicated that the defect of the first open Internet rules was the failure of the FCC to classify both fixed and mobile broadband as telecom services. And accordingly, Verizon said, the FCC was not able to regulate it as common carriers. Now, the petitioners are saying something different. They are saying, well, after all, the FCC was legally barred from classifying mobile broadband as a telecom service in the first place. They are not right. This agency has been trying very hard to get this right for 10 years. It has received sage guidance from this court. It has implemented it. And to your question, Judge Tatel, it has not really abandoned Section 706. It has embraced 706 and supplemented it, perhaps turbocharged it, with Title II. Say once again why someone who has only a cell phone is interconnected to the public switch network. As to the 73.6% of whom you are not a member. No, no, no. I actually, just so the record is clear, I actually have a smart phone. For all practical purposes, it works for me as a cell phone. I am, okay, I am equivalent to someone who only has a cell phone. So now, how am I interconnected? So, the non-smart phone person can certainly be reached, can certainly be reached. Reached, but how can the person reach someone else who doesn't have a phone number? He can reach everyone on the North American Numbering Plan Network because it is an either or definition. And the definition of commercial mobile service in the statute says the public or such classes of users has to be available to a substantial portion of the public. It never says more, all of the public. That's the definition of commercial mobile service, right? Correct. That doesn't tell you what public switch network means. It does because public switch network is a building block into defining what a commercial mobile service is. So, it seems to me that the definition of public switch network. Well, it doesn't tell you what interconnected with the public switch network means. Not necessarily, but I think its meaning should be informed by the public or categories of users have to be significantly available to a substantial portion of the public. Those petitioners have been fighting tooth and nail the agency at every step for ten years using different and sometimes inconsistent arguments. They should not succeed this time. Okay. Thank you. Thank you. How much time did counsel have left? You can take comments. Thank you. Well, first of all, Judge Williams, in response to your question about source authority for the proposition about Congress' purpose in 332, I'd refer the court to paragraph 389 of the commission's order here where the commission said, Congress adopted the commercial mobile service provisions in the act with the goal of creating regulatory symmetry among similar mobile services. That's exactly what I've said. The commission said it here as well. With respect to ubiquity, ubiquity is not a function. Two ubiquitous things are not functionally equivalent just because they're both ubiquitous. The postal network is ubiquitous, but the internet and the postal network are not functional equivalent. And I've checked the citations that intervener's counsel just mentioned. We never said, please don't replace your existing functional equivalence test with a ubiquity test. We would have had to have been psychics to be able to know to address that. There was no indication that that was on the table. Mr. Lewis said that they pointed us to the statute. We didn't need to be pointed to the statute. We know the statute. We know where it is. We needed to be pointed to what the commission was thinking about doing. And we had no notice that the commission was thinking about amending multiple rules and ignoring another standard and the opportunity to comment on it. And the law here is not that notice is sufficient if you get pointed to the statute and are asked to imagine what possible changes might be in store. This court said in HBO versus FCC that the agency's obligation is to set out its thinking because it's the one opportunity the public has to learn what the agency thinks it knows as the repository of expert opinion. And so the agency has to give notice in what the court called a concrete and focused form so as to make meaningful criticism possible. And that's the standard that we're saying should be applied here. Finally, with respect to the merits of the argument, Mr. Lewis said that networks can have subnetworks. And, of course, that's true. The Internet is a network of networks. The telephone network is a combination of the local exchange network and the inter-exchange network and foreign networks. But what's characteristic of those is they're combinable because you can enter on any point and reach somebody on any point. And that's not true of the Frankenstein monster network that the FCC has sewn together here between the Internet and the telephone network. Mr. Lewis said that it's always been the case that, for example, you could still be interconnected even if you blocked 900 calls. And that's right. It doesn't destroy being interconnected to the network if the parent subscribes to a That kind of de minimis exception has always been understood. And that's why the statute says it's enough to be connected to substantially all of the public. That's different from the situation here where if you just have a mobile telephone number, you can't reach hundreds of millions of endpoints on the commission's supposed single network that combines the Internet and the telephone network. And finally, with respect to our contradictions impeaching each other, I would just like to respect to the Internet conduct standard and everything in the first segment did not join the section of the brief on wireless. That was a section of the brief that was only on behalf of CTIA and AT&T. And those are the parties who are making this argument here. The court has no further questions. Thank you. So we'll move on to Mr. Schumacher said on personal issues. Right. Yeah. Yeah. May it please the court. But you made four petitioners, Alamo Broadband and Daniel Berninger. The court's permission. I'd like to reserve two minutes for rebuttal. The First Amendment protects every other medium of mass communication, from newspapers to cable television. Companies that provide access to the same content on the Internet engage in and transmit speech, and they are entitled to the protections of the speech and press clauses of the First Amendment. I'd like to address three points today. First, why broadband providers are speakers and members of the press. Second, why these rules are subject to strict scrutiny. And third, why the rules fail even intermediate scrutiny. Turning to the first point, the First Amendment has always limited the government's ability to regulate the dissemination of content. Broadband providers perform the same function as a printing press. Before you get into the specifics of your First Amendment argument, I just want to make sure I understand. You're not challenging the reclassification, right? Not in our brief, Your Honor, but we join the petitioners. We agree with them that the reclassification decision is unlawful and should be vacated on that ground. If the court does not vacate the reclassification decision, the court will likely have to reach the First Amendment issue, which we're challenging. So broadband providers are speakers and members of the press, and I think the court recognized as much in the Verizon decision, where the court said there's no material distinction between a broadband provider and a cable operator. Like cable operators, broadband providers exercise discretion over the content that transmits their networks. In fact, the rules presume that broadband providers might exercise discretion to discriminate or prioritize some speech over other speech. As Judge Tatel, you wrote for the court in Verizon, these rules transfer control over the content that transmits broadband networks from the network owners to the edge providers. When people buy Internet service, they're just not buying. It's not like cable television. They're not buying different kinds of content. They're buying access to the entire Internet. That's correct, Your Honor. In Judge Srinivasan's example, if he's watching content on his iPad at home, in the government's view, the First Amendment protects his cable operator when he's watching HBO on his television. But that's because the cable operator is assembling different packages of content and deciding what to sell, Judge Srinivasan, and he's buying different parts of it. But that's not true with respect to broadband. When you buy your service from an Internet provider, you don't expect that Internet provider to be picking which edge providers you're able to access or which combination. Judge Tatel, it's all circular, just like it was in the Verizon case. The court said the FCC's argument is flawed because broadband providers, excuse me, edge providers can be, there could be the customers of broadband providers, but the rules foreclose that ability. So too here. The rules prohibit broadband providers from exercising the editorial discretion that they have. But I think to be in this portion of the argument, I guess I get that you joined the challenge for reclassification, but to be in this portion of the argument, you would have lost on reclassification such that broadband providers are validly regulated as common carriers. Correct. And if you're a common carrier, it seems like with all common carriers, the expectation is that you're a pipeline to everything. You hold yourself indiscriminately open to everything. And once you do that, if you want to be a provider who segregates content, I suppose you could. You could say, I want to be an ISP who's focused on named topic. But then once you do that, you're no longer subject to the regime anymore because you're not a broadband Internet access provider or BIOS. I forget what the acronym stands for, but you're not subject to the rule anymore precisely because you're discriminating on the basis of the content as you presuppose. That's not exactly true, Your Honor. The Commission gives an example in a footnote in their brief in the First Amendment section about a broadband provider that wants to offer a filtered Internet service. They never said that in the order. In fact, they said quite the opposite. They said if you want to offer a family-friendly Internet service, that would be reviewed for reasonable network management, which means it would be subject to the rules. And the definition of broadband Internet access service also encompasses any service meant to evade the rules. So the Commission could, in its discretion, decide that that type of service actually is a broadband Internet access service and can sweep it in. And to your point about common carriage, the label doesn't matter. Congress tomorrow could declare broadcasters and cable companies as common carriers. It wouldn't change the First Amendment analysis in Turner and other cases. So too here. Well, I don't understand why it wouldn't. You have to explain that. Judge Stadel, there's always been a constitutional distinction between The Supreme Court has distinguished between services like cable and common carriage, which has to serve indiscriminately all. The court has never addressed the First Amendment rights of common carriers. What it has said, you're correct, is that broadcasters, cable operators are not like traditional common carriers, which are transmitting voice communications, private communications. And a traditional common carrier exercises no control over the content that transmits its network. Cable companies do. And what the court said in Turner is that cable companies are speakers and members of the press because they exercise editorial discretion over the content and then they transmit it. Broadband providers have the capability to do the same thing. Have the capability. And my understanding is that historically the occasional ISP has done so, although subject to heavy frowning by the commission. Is that correct? I think particularly Metro PCS. That's correct, Your Honor. What the commission has done to this industry for 10 years is it's had the industry under rules, proposed rules, or a threat of rules for 10 years. So because you're not seeing more editorial discretion doesn't mean broadband providers aren't speakers and members of the press. They could be, but the commission is taking away that discretion that they inherently have because they're transmitting mass communications. Communications intended for audiences. The commission says, I think, at least it's brief and perhaps in the order, that if an ISP comes along and says, flatly, we are selective, and it doesn't define how selective they must be, then we would look at that and presumably remove them from the common carriage mandate. I believe they said that. I'm pretty sure they said that in the brief. But in the order, Your Honor, I believe it's footnote 575. They say this family-friendly Internet service would be part of the rules and would be reviewed for reasonable network management. And what this order does, it gives the commission all the discretion in the world to regulate the dissemination of content. It's a lot like the law in the city of Lakewood, which involved the placement of news racks. The Supreme Court said, this law gives too much discretion to the government to decide how speech should be disseminated. So too here. Broadband providers are the means to disseminate content. Can I ask this question? Sure. Suppose we're dealing with a broadband provider that doesn't want to discriminate. I don't know the parameters of the family-friendly one. But let's just suppose you want to be the classic broadband provider who's the target of the rule, which is indiscriminate access to the web. For that person, are you making, for that entity, are you making the same first amendment argument and saying that they're the same thing as a cable operator? Yes, because that would, that should be a matter of... Because for them, I've just defined out why they're, why, why, I've just defined why they're not like a cable operator anymore, because they're not making content selections. That should be a matter of choice rather than regulatory compulsion. So New York Times in their website, if they accept all comments on their website, or all classified ads, they don't forego or surrender the right to discriminate or choose not to accept certain ads. So too with a broadband provider. Federal law protects broadband providers from any liability for anything they transmit, right? That's correct, Your Honor. Well, isn't that, isn't that, isn't that protection dependent on the fact that Internet providers don't exercise any control over their content? No, Your Honor. And if you do, wouldn't, wouldn't, if in fact Internet providers do exercise control over content, doesn't that lose the whole rationale for protecting them from liability? No, Your Honor. Congress had to grant that immunity because broadband providers do exercise that type of editorial discretion over content on the Internet, and the Communications Decency Act actually encourages broadband providers to restrict access to content that's lewd, harassing, violent, or otherwise objectionable. So Congress, at the same time it's granting immunity for things that you, a broadband provider transmits over the network, also says, yes, there is a value to this editorial function that a broadband provider performs, just like in the cable context. I don't know how the court can distinguish broadband providers from cable operators when in the Verizon case the court said there's no material distinction. It said Midwest Video 2 is indistinguishable. And the court rejected each of the reasons that the FCC was providing to distinguish that case from the Verizon case. And one of the particular reasons that the court rejected was the commission's argument that cable operators exercise editorial discretion or control over content. And Judge Tatel right in front of the court said that's not a basis to distinguish broadband providers because they do exercise control. Whereas previously they could have discriminated against the content of certain edge providers, these rules prevent them from doing so now. I'd like to turn briefly to application of scrutiny. We believe that strict scrutiny should apply, but in the event the court applies intermediate scrutiny, I believe there's two reasons why the rules fail intermediate scrutiny. And the first is that the government made no attempt to tailor the rules to minimize the burden on speech because it didn't view broadband providers as speakers at all. As the court wrote in Verizon, this is a compelled carriage obligation that applies in all circumstances and with respect to all edge providers. The government's First Amendment analysis in this case just doesn't reflect the care and caution that the First Amendment requires. The commission also says in the order that I see my time is up. Your time is up. Why don't you just finish up? One final point is that the transparency rule itself, the commission recognizes, would be a less restrictive alternative and still effective at preserving the open Internet. So paragraphs 154, 563, and 575. If there are no further questions. Thank you. I please the court. Broadband Internet access providers are engaged in transportation, not expression. And that's clear from the definition, the commission's definition, of what broadband Internet access service is. It is a service that provides the capability to transmit and receive data from all or substantially all Internet endpoints. What is the scope of the exception that either was in the brief or the order, I forget, for broadband service providers who explicitly say, as Metro PCS did, we're going to provide a limited set of services? So I think that was in the section of the order describing what the commission contours of reasonable network management might be. But I think the point here is. I thought somewhere the commission spoke in terms of whether common carriage was created, spoke about broadband access providers who explicitly wanted to be selected and said they were selective. If they're selective, they want to curate the Internet, and they curate or select, provide a service that provides you access to some, not substantially all, just a filtered group. I think that would drop them out of the definition of broadband Internet access service. Okay, and they have that option under the order. Absolutely, Your Honor. There is a discussion in the order of what non-broadband Internet access services would be, and the definition of a broadband Internet access service is to get at those services which we have, which the petitioners here engage in, is a mass market retail service to provide people, and they sign up for it, to get to all of the Internet. There are some other services that filter the Internet. If they filter the Internet and don't provide access to all or substantially all endpoints, then they drop out of the definition of broadband Internet access service. The rules don't apply to them. So what we're talking about are rules that are limited to services that provide access to everywhere. They're not services that curate the Internet, and they're not services, and these parties are not engaged in the business of providing people a limited selection of the Internet on the basis of their expressive views. The First Amendment, of course, applies to expression, but transportation, being in the business of transporting people to all or substantially all endpoints of the Internet, is not expression. And the fact is the Commission's rules, which restrict the ability to block and other things, are going at these broadband providers' transportation function. So the threshold issue, which the Commission said, they are conduits of other parties' expressive conduct, web content, and they are not themselves in so far as they are engaged in this business, broadband Internet access service, of being expressive entities or engaging in... Yeah, I mean, there are selective conduits. I think it doesn't seem to me that classifying it as a conduit gets you where you want to go. Well, I think the notion of conduit is that they're not, is another way of saying is that this business is not, they are not in the business of engaging in expression of what points they're going to transport folks to. I guess I should have said conduit by, you're correct, Your Honor, the conduit by itself is not enough. The broadband Internet... Conduit without a toll booth. In other words, it's a conduit that exists for everybody. A conduit to everywhere is what I should have said. And that's what their business is. And when you're a conduit to everywhere, you're not in the business of curating the Internet to exclude speech that you don't want to transport. That's not the business they're in. That's not what they're marketing. But even if, and if I could just turn to the second point, because, of course, even if the court thinks there's some expressive conduct involved in this definition service, and we don't think there is, it would clearly satisfy intermediate scrutiny. These are not content-based rules. They are triggered by, the rules are triggered by the companies engaging in the provision of broadband Internet access service. And so it has nothing to do with the particular content they want to distribute, that they don't want to distribute. And they're perfectly free, by the way, to distribute, to have their own independent websites or distribute their own speech in any other fashion. It's just when they're purporting to engage in the transportation of data to and from all endpoints of the Internet, then they're not engaged in speech. But to go to the intermediate scrutiny point, at a minimum, there's at least three compelling, or substantial is what we need to show, interests. There's the interest in fair competition in this area. There's the interest in the widest possible diversity of sources. These are interests that Turner Court recognized. And there is also the interest in keeping the Internet open and the deployment of broadband, which Congress recognized in 706 and this court in Verizon upheld. And the tailoring comes, I think, with the definition of the service to which the rule applies. It is this narrow class of service that undertakes to take parties to everywhere on the Internet and to act, and so they act as a conduit. And Judge Srinivasan, you are absolutely right. If you get to this point in the argument, it's because the commission has properly classified broadband Internet access service as a Title II telecommunication service, a common carrier service. Common carriage has never been thought to be a service which implicates, or common carriage obligations have never been thought to implicate First Amendment problems. The old Ma Bell didn't have an expressive right to say, I don't want to connect or answer that, distribute that phone call or switch that phone call, because of the speech that may or may not be undertaken on that particular conversation. I don't mean to beat a dead horse, but why is it that Metro PCS had such difficulty with the commission? I mean, I know it never eventuated in an order, but that, I gather, was because Metro PCS thought it wasn't worth the battle. But it would seem to me that a commission concerned about not violating the First Amendment would have been very hesitant to lower over Metro PCS to claim that its business model was unlawful. Well, I'm sorry, Your Honor, I'm sure there are many in the audience who know exactly what you're referring to. It's basically a low-cost data plan plus free access to YouTube. Oh, I'm sorry. There are obviously important competitive concerns about the way the service can be provided. This is the underlying aspect of the rule. But the underpinnings of a First Amendment argument are that those decisions are made or not made because of actual expressive decision on the part of the distributor. And the mere commercial arrangements to say, well, look, we'll promote a particular type of content because, for example, we're being paid more, doesn't itself trigger, if I don't understand Metro PCS as saying, well, look, we happen to like particular content and we're distributing because of the nature of that content. Does the First Amendment depend upon the motive of the selective conduit? The First Amendment has applied to conduits. I mean, Comcast wants to make money. That's the purpose of its cable service, right? I think it depends on whether the broadband internet access service provider is engaging in its own expression. And if it just takes the money, there's no expression involved in that. It would have to show that it is taking the money as part of its business because it is picking winners and losers, not for competitive reasons, but somehow because of the underlying expression. And that's where the First Amendment issue comes in. Did the petitioners in Turner Broadcasting make such a claim? Make such a what? A claim that it was their personal ideas of what was in the public interest and so forth. It wasn't personal ideas in the sense that cable companies are engaged in editorial discretion. They were both, and the court was very clear about this, they not only transmit the speech, but they pick the packages, as Judge Tatel said. That's the point it was. That was true of Metro PCS. Well, I'm sorry, Your Honor.  Look, maybe the way to say this is, if some internet access provider wants to refashion their business to be more like a cable company and give a package of programs rather than what the commission is regulating, which is providers that promise not that you're going to get a select package of programming, but that you're going to get everything on the internet, then if they're selecting the programming, they may look more like a cable operator. This is not what they're doing here. This is not, and in particular, it's not what the commission's definition of broadband internet access service covers. If the court has no further questions. Thank you. Did counsel have any time left? You can take one minute. Thank you, Your Honor. Really quickly. Yeah. The purpose of the rules is to foreclose broadband providers from exercising editorial control over the content on their networks. There would be no need for open internet rules if broadband providers were not speakers because there wouldn't be any discrimination. There wouldn't be any prioritization. You wouldn't need a reasonable network management exception to the rules if broadband providers had no discretion or control over the content on their networks. I want to go back to Turner. Turner said a conduit function actually described cable companies as a conduit. That is protective speech because, in the words of the four dissenters, selecting which speech to transmit is no less communication than creating the speech in the first place. What the commission is concerned about is that broadband providers might select speech to transmit, and the purpose of the blocking, throttling, and prioritization rules is to foreclose that. Thank you. Thank you. So we've reached the last subject matter, full-service networked issues, and we'll hear from Mr. Comstock. Thank you, Your Honor. Please, the Court, I'd like to reserve two minutes for rebuttal time, please. What this whole discussion illustrates is that, and what I'm amazed is lost in the discussion, is the congressional scheme here. The 1996 Act was a complete revisitation of the 1934 Communications Act. Congress went through every section, every title. It even got down to the point of individual regulations that the FCC had adopted in the preceding 60, or actually at that point, yeah, 60 years. So, you know, here we are 20 years later, and we're just having a debate, and the statute's almost never mentioned. And my clients were people who were supposed to be the beneficiaries of very specific provisions included in that statute. Congress, in 1996, you hear a lot about, oh, they protected the Internet, they protected this. Well, look at the statute. Read the statute.  Internet access is addressed in the statute. It should be telling, as the Supreme Court said in McCabe v. Lanier, that Congress omitted protections for information service. It omitted protections for Internet access. It had that opportunity. They're not there, as these people claim. And so what Congress focused on in Title II of the Act, which they substantially overhauled by adding not one but two additional subtitles to it, they reaffirmed that common carriage was the basic mantra under which communications would be offered in this country. And then they added the second chapter, opening markets to competition. What was that focused on? It was focused on opening the local market to competition. That local market, that local connection to the information superhighway, the on-ramps to the information superhighway, if you go back and read any of the debates, was a key focus of the statute. And they provided very specific rules for how to do that. So they said telecommunications, somebody provides telecommunications service, shall be treated as a common carrier. They reiterated that. And the protections that you hear about that are supposedly built in, in Section 230? Can I still leave open the question of what's a telecommunications carrier service? It does, Your Honor. It's treated as a common carrier, but still there's the question of what does that mean? That's right, Your Honor. And here I would say, please, read the definition that the FCC. That's what we've been doing all morning. And what I'm saying is you can have any. He's read his definition hundreds of times. Yes, Your Honor. What I would say is look carefully at the FCC's definition of broadband Internet access service is the capability to transmit data to substantially all Internet endpoints. How is that any different from the statutory definition of telecommunications, which says the capability for a user to transmit information between or amongst points that they specify? It meets that definition. We don't have a Brand X problem here, because in Brand X they were debating a service that was much more, much more defined. Didn't Brand X say the Commission had discretion to define it either way under the ambiguous term offer? Yes, Your Honor, they did. But that ambiguous term offer was in the context of a definition of a service that included both information processing and transmission. The FCC has gone back, and they get confused about this in their own brief because they refer to the transmission component of broadband Internet access. The definition of broadband Internet access service is solely the capability to transmit that information to substantially all Internet endpoints. There is no information processing here. So Brand X doesn't apply because for the simple reason that you don't have any information processing to combine with that offering. We're only talking about transmission. And that's the point that my clients are focused on. Back in the prehistoric times when you went to AOL and then you clicked through to the Web, that click through didn't involve any information processing? Your Honor brings up a very good point, and that goes back to this discussion of what was the public switch network. In 1996, the public switch network included everything that reached the Internet. That was the only way you could get to this broader Internet. So when Congress was debating the 1996 Act, they knew about the Internet. They had a whole title on Communications Decency Act, Title V, that focused on porn on the Internet. So they clearly knew about the Internet. They did not put in any rights for information service providers other than the protection you were just recently talking about in Section 230, which you're absolutely right, does only protect you if you're a common carrier carrying that speech because you don't control the speech. So the same thing with commercial mobile service. In 1993 when Congress did commercial mobile service, they were focused on personal communication services. The service is coming next. They were looking forward to the 21st century. So as the other petitioners would have it, and frankly the FCC would have it, somehow Congress missed the whole boat in 1996 and didn't do any of this. So what my clients are concerned about is the forbearance that seems to be integrally wrapped up in here. I thought you would get to that. Well, I am. And that forbearance is critical because Congress set up this scheme that they intended the commission to follow. And literally since basically the early 2000s, they've been doing everything they can to get out of it. They said, oh, these services, this broadband Internet access service, it's an information service. Therefore, the statute doesn't apply. Oh, now we get to the point where they say, oops, whoops, we made a mistake. We're going to go back and say it isn't a telecom service. They didn't say they made a mistake. Oh, I think they did. They came back and said things have changed. Things have changed. Yes, things have changed. Well, not even things have changed. The commission has just evaluated the offer differently. But that's the point. Maybe it was wrong in Brand X, but did you see that anywhere in the order? Did I see anything? What? Commission saying it was wrong. I saw the commission basically saying that they were now revisiting their determination. Right. We got that straight. So go ahead. Okay. So at any rate, what's so fundamentally flawed here is where does the statute fit into this? Congress defined telecommunications, telecommunications service, whether you take the FCC's view that they have the discretion. I thought you were going to talk about forbearance. I am talking about forbearance, Your Honor. I'll get to that. Okay. The point is they granted certain rights that were supposed to promote competition to help protect consumers. Right. The commission now says, oh, we don't need to worry about that detailed congressional scheme for promoting competition for solving many of the problems that Judge Williams has been raising about this because we're going to have multiple competitors like we did in the 1990s and the 1980s in resale, which this court heard numerous cases about. They're going to go back and they're going to ignore that entire congressional scheme and say, oh, we can forbear from that. We can waive that because it's important for our light touch policy, a policy found nowhere in the statute, that we go forward on this. They've had 10 years of the light touch policy and the light touch policy hasn't produced the results they predicted. They admitted that in paragraph 330 of the order, that they could not reconcile their predictions with the actual facts. They've gone back now and said four times that broadband's not being deployed. Here's the interesting thing about the view of both the FCC and the plaintiffs. If information services are, as they say, how do you build a network? How do you get access to rights of way? My companies, in order to get access to rights of way, have to be a regulated telecommunications carrier. Why? Because Congress reserved access to those rights of way to regulated entities. So, oh, but the guys that already built their network, either as a cable operator or as an incumbent telco, they can do whatever they want. They don't need access to it because they've already got it. So how does that work? That's why you say you need to step back, as the Supreme Court said in the Utility Area Regulatory Group, and say, what's the bigger picture here? And that's the problem. They can't square their arguments with the actual statutory text. I thought the core of your argument was that the commission had had a standard for applying forbearance, namely that at least in an economic issue, which your issues clearly are, it would only do so where there was competition, where competition would satisfy the statutory purpose. And here, it retreated from that position. Right? Without justifying the retreat. The FCC actually mischaracterized our argument. We never said competition was the only basis on which you could forbear. What we said is the statute asks you to look, and you have to look in the context of the statute. We're talking about local exchange carriers. They basically said, oh, we can just forbear for all local exchange carriers across the country without ever looking at the market conditions. And our point is, no, Congress had a whole regime focused on promoting competition in the local exchange market. Well, I mean, the commission surely is right with the proposition that it has done forbearance without an individual geographic market by geographic market study. Right? Well, you're correct that there is a case on point on that. Yes, Your Honor. Right. But a theory in Earthlink, which I take you to argue, is inapplicable here. I would, Your Honor, for the simple reason that you were looking at it in a different context. And here, they're coming back and saying a service that, you know, when they made that broad geographic claim, it was in the context of their light-touch policy. And what we're saying is take a look at what the statute says. Look at the statutory definitions. Congress clearly was looking at the local markets when it was talking about these things. And so to apply essentially the same standard across the board in determining waiver for forbearance, that's just not applicable. The other thing we'd point out is since that time... Just to be clear, you think that we were wrong in allowing them to do what they did at Earthlink. Is that... Is that the correct... Well, Your Honor is always correct as to... I mean, I wasn't on the panel. I have no... But I'm bound by it. Yes, Your Honor. And I would say take a broader view, take another look at that. But the other thing to keep in mind is since that time, they passed their own regulations. And in their own regulations, they lay out a market test. They then try to say, oh, those regulations don't apply to me. But the point is the only issue that Section 251 deals with is competition. It's designed to promote local competition. So you can't say that waiving Section 251 is about anything but competition. That's the whole purpose of that section. So their argument fails on that basis. And they should have applied their own regs, which required them, if you look at Section 47 CFR 1.54, they should have gone through that step. All right. Thank you. Hear from the Commission? My first point is I don't disagree that mobile or unfixed broadband Internet access service are Title II services. Disagreement. So for that respect, I'd like to make clear that we agree with full service network. It's the path by which they get there. We do think that in this respect they are trying to relitigate Brand X. But to go to the forbearance point, the Commission's determination here with regard to forbearance was part of an overall effort to tailor the regulations to the minimum necessary. Tailoring rule in New York? No, it's not like the tailoring rule in New York. And here's an important point about that. To look at the statute once again, with the statute here as Section 10 of the Act, grants the Commission broad forbearance authority, both from statutes and rules. And it is unqualified. And the fact is you will find nothing in Section 10 that limits the Commission's ability to take a broad look at necessary forbearance. The Commission has historically, in applying forbearance, looked at the presence or absence of competition as a substitute protector for consumers. And in many situations, competition will be a reason for forbearance. But it's not in all situations. The statute itself in 10b says that the Commission is supposed to take competition into account, but it doesn't say that competition is controlling. Here the Commission did take competition into account. And I think the gist of the full service network complaint resides in the Commission's decision to forbear from 251, Sections 251 and 252 of the statute. And there the Commission explained in order at paragraphs 513 and 514 that there were other protections that remained that would leave the Commission with sufficient authority to deal with problems that might arise. And there were advantages. And broadly, that means Congress really had no need to put 251 and 252 in. Well, you're right. Or they could have just made them precatory. I think that to its logical extreme is the import of Section 10, that it is the case that under Section 10 the Commission can forbear from a specific provision of the Act, including 251 or 252. It doesn't mean that they didn't serve a purpose or that they don't still serve a purpose in other contexts, but it certainly gives the Commission the authority to look at this context, a context in which it was retaining Sections 201 and 202, and say we don't need the specific protections of 251 and 252. There were some that the tailoring aspect comes in. You don't have to take all of what comes along with the 251 and 252 in order to protect the concerns with regard to interconnection or unbundling or those relationships. You can do that under 201. Does the order reflect any intention on the part of the Commission to issue the sort of orders that it historically has under 251, 252? I'm sorry, Your Honor. I know it says vaguely, well, 201 and 202 can do the job, but does it indicate any indication how it's going to actually use those? No, I think that remains to be seen, and it doesn't mean that the two have to overlap precisely, because after all, as Earthling says, and other decisions, including the U.S. Telecom decision of this Court say, Section 706 specifically enjoins the Commission to use forbearance authority to ensure to promote the deployment of broadband, and so one of the factors the Commission took into account is whatever dampening impact there might be by not forbearing from 251 and 252. So it doesn't mean that the Commission is in exactly the same position after forbearing from 251 and 252 than it would be if those provisions were in place. The question before this Court is whether it was sufficient that the Commission knew it had in its hip pocket at least a general authority under 201 and 202. The authority for the Commission to forbear is very broad, and the Commission here was making a judgment call about what Title II provisions to retain and what Title II provisions it could reasonably forbear from, and nonetheless maintain the open Internet protections that it thought were crucial in this case. If the Court has no further questions. Thank you. Counsel, you have no time, right? You can take one minute, if you'd like it. Thank you, Your Honor, and just very quickly, again, this goes back to the point, you cannot use Section 201 to do 251. That's exactly why Congress added it. Section 251 delves deeply into local, and if you look at prior Supreme Court cases, they've said that. You cannot require interconnection. You had a case here in this Court before that said you can't use 201 to do interconnection. So the FCC's argument that somehow they've got this back pocket safety net, it's just simply not there. And again, the problem is Congress, in crafting the 96 Act, heard all these arguments, heard all these things about you should exempt these people, and they came up with a very specific regime for the FCC to just be able to say, oh, well, we've decided that it's more important to do broadband deployment, which, oh, by the way, was not included in the statute. It was left as a freestanding provision of law to which this Court should assign some importance. It was not included by Congress. Again, at the end of the day, you should go back to what Congress did and what Congress actually said, and they had a very specific regime that the FCC should not be able to so easily deviate from. Thank you. Thank you. So, counsel, going all the way back to 930, thank you all for your presentations. The case is submitted. Thank you.
judges: Tatel, Srinivasan, Williams